UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JEFF J. MARWIL, AS RECEIVER FOR CHURCH EXTENSION OF THE CHURCH OF GOD, INC. and UNITED MANAGEMENT SERVICES, INC., | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:03-cv-0787-DFH-JMS |
| | ) | |
| v. | ) | |
| | ) | |
| CURTIS CLUFF and PARTNERS IN ACTION, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON MOTION FOR JUDGMENT ON THE PLEADINGS
AND MOTION TO DISMISS

As part of a civil enforcement action brought by the Securities and Exchange Commission, the court appointed plaintiff Jeff Marwil to act as conservator and receiver for Church Extension of the Church of God, Inc. ("CEG") and its wholly owned subsidiary, United Management Services, Inc. ("UMS"). See generally *United States S.E.C. v. Church Extension of Church of God, Inc.*, 429 F. Supp. 2d 1045 (S.D. Ind. 2005) (imposing civil remedies against former executives of CEG and UMS after jury findings of securities fraud). Acting as receiver, Marwil has sued defendants Curtis Cluff and Partners in Action, Inc. ("PIA") in this action on claims arising out of four real estate transactions between CEG and the defendants that occurred between August 1998 and December 2001. In Counts I and II, Marwil alleges that all four transactions amounted to fraudulent

conveyances under Indiana Code §§ 32-18-2-14 and -15, respectively.  In Count III, Marwil seeks equitable disgorgement of the proceeds of all four transactions. In Count IV,  he alleges breach of contract in the December 2001 transaction.  In Count V, Marwil alleges fraud in the December 2001 transaction.  In Count VI, Marwil alleges that the defendants breached a settlement agreement the parties reached in February 2006.

Defendants Cluff and PIA have moved for judgment on the pleadings on all counts pursuant to Federal Rule of Civil Procedure 12(c).  In support of their motion for judgment on the pleadings, defendants argue that Marwil lacks standing to assert all claims in the amended complaint.  In the alternative, they have moved to dismiss all counts with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).  With regard to Counts I, II, and III, those alleging fraudulent conveyance and seeking equitable disgorgement, defendants argue that the doctrine of *in pari delicto* bars Marwil from asserting claims on behalf of CEG even if standing is proper.  Defendants argue that Counts I and II, as they pertain to the August 1998 transaction, are barred by the statute of limitations.  With regard to Count IV for breach of contract, defendants argue that Marwil failed to plead a claim against Cluff personally.  Defendants assert that Marwil failed to plead sufficiently a cause of action for fraud in Count V.

For the reasons explained below, the court denies defendants' motion for judgment on the pleadings and grants in part and denies in part the defendants'

motion to dismiss.  Although  Marwil lacks standing to assert claims directly on behalf of CEG noteholders, the motion for judgment on the pleadings is denied because Marwil has properly asserted claims directly on behalf of CEG, an entity he clearly has standing to represent.  To the extent that the Count IV breach of contract claim is asserted against Cluff personally, defendants' motion to dismiss is granted.  Counts I and II are also dismissed as time-barred insofar as they pertain to the August 1998 transaction involving property in Memphis, Tennessee. Marwil's remaining claims in Counts I, II, and III are not barred by the doctrine of *in pari delicto* at this stage, and he sufficiently pled fraud in Count V.  The court denies defendants' motion as it pertains to these issues and claims.

### The Applicable Standards

Defendants' challenge to Marwil's standing is a challenge to the court's subject matter jurisdiction.  The decision on this issue is based only on the pleadings, without additional evidentiary material. In considering a motion to dismiss for lack of standing addressed only to the pleadings, a district court must accept as true all material allegations of the complaint, drawing all reasonable inferences in the plaintiff's favor.  *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003), citing *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996).  The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the required elements of standing.  *Lee*, 330 F.3d at 468, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "If standing is challenged as a factual matter, the plaintiff must come forward with 'competent

proof' – that is a showing by a preponderance of the evidence – that standing exists." *Lee*, 330 F.3d at 468, quoting *Retired Chicago Police Ass'n*, 76 F.3d at 862. The court may allow the plaintiff to supply, by amendment to the complaint or by the submission of affidavits, additional particularized allegations of fact to support standing. *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

In ruling on a motion to dismiss under Rule 12(b)(6), the court must assume as true all well-pleaded facts set forth in the complaint, construing the allegations liberally and drawing all inferences in the light most favorable to the plaintiff. *Brown v. Budz*, 398 F.3d 904, 908-09 (7th Cir. 2005); *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000); see generally *Bell Atlantic Corp. v. Twombly*, 550 U.S. —, —, 127 S. Ct. 1955, 1964-65 (2007). The court may consider any written instruments attached to the complaint as exhibits. *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 858 (7th Cir. 2002).

A complaint need not contain detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, but it is not enough merely that there might be some conceivable set of facts that entitles the plaintiff to relief. *Bell Atlantic Corp.*, 550 U.S. at —, 127 S. Ct. at 1968-69, abrogating in part *Conley v. Gibson*, 355 U.S. 41 (1957). Instead, a plaintiff has an obligation under Rule 8(a)(2) of the Federal Rules of Civil Procedure to provide the grounds of his entitlement to relief. This obligation requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action is insufficient. *Bell Atlantic Corp.*, 550 U.S. at

—, 127 S. Ct. at 1965. Factual allegations, taken as true, must be enough to raise a right to relief above the speculative level. *Id.* Moreover, a plaintiff may plead himself out of court if the complaint includes allegations that show he cannot possibly be entitled to the relief sought. See, *e.g., Jefferson v. Ambroz*, 90 F.3d 1291, 1296-97 (7th Cir. 1996); *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995), citing *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994).

## The Amended Complaint

In considering defendants' motions, the court accepts the following allegations as true. CEG is an Indiana non-profit corporation that was founded to raise funds for the Church of God, a church based in Anderson, Indiana, with more than 2,000 affiliated congregations and more than 230,000 members nationwide. From 1996 to April 2002, CEG sold investment notes worth more than $85 million, mostly to church members. CEG represented that the funds from these notes would be used primarily for interest-bearing loans to local churches. See generally *United States S.E.C. v. Church Extension of Church of God, Inc.*, 2005 WL 3370568 (S.D. Ind. Dec. 12, 2005) (entry denying defendants' Rule 50 motion in SEC civil enforcement action).

Marwil alleges that CEG instead used the majority of the note proceeds to make payments to prior CEG investors and to fund speculative real estate "bargain sale" transactions. In such transactions, a charitable organization acquires a property at less than fair market value and treats the difference

between the purchase price and the fair market value as income on its financial statements. (The seller may treat the difference as a charitable contribution.) Such transactions may be perfectly legitimate.  However, the SEC alleged and proved in the civil enforcement action that CEG entered into at least nine major bargain sale transactions from 1996 to 2002 where the claimed income was not legitimate because the supposed values of the properties were fraudulently inflated.  Marwil alleges that these transactions resulted in claims by CEG of more than $24 million of false "income" on its financial statements.  Marwil asserts that CEG was actually insolvent by 1998.

Marwil alleges that two of CEG's four transactions with the defendants, those occurring in August 1998 and September 1999, were improper bargain sale transactions in which the claimed differences between purchase prices and fair market values were fraudulently inflated.  On August 11, 1998, CEG's real estate management subsidiary UMS entered into a purchase agreement for three of defendants' low-income housing complexes in Memphis, Tennessee.  Am. Compl. Ex. A.  CEG purchased the Memphis properties for $6,750,000.  *Id.*  CEG's appraiser, Nick DeAngelis of DeAngelis Appraisal and Consulting Services, reported the fair market value of the properties as $13,455,000, which allowed CEG to recognize "income" of $6,705,000 from the transaction.  Am. Compl. ¶ 31. Marwil alleges that the transaction was a fraudulent conveyance because the Memphis properties were not worth anywhere close to the supposed "bargain" purchase price, so that CEG did not receive reasonably equivalent value in

exchange for its agreement to purchase them.  Marwil also asserts that CEG's remaining assets were unreasonably small in relation to this transaction and other transactions with defendants.

On September 29, 1999, CEG's subsidiary, Church of God Retirement Communities, Inc. ("COGRC") purchased from defendants three low-income, federally regulated apartment complexes located in West Memphis, Arkansas. Am. Compl. Ex. C.  Under the purchase agreement, COGRC assumed control of Partners in Action of the Mid-South, Inc. ("PIAMS") and assumed liability for PIAMS' $1,800,000 mortgage on the West Memphis properties.  Am. Compl. ¶ 45. DeAngelis appraised the properties for $4,500,000, which allowed CEG to realize "income" of $2,700,000 from the transaction.  Am. Compl.  ¶ 46. Marwil contends that the properties were not worth the appraised value or even the amount of the mortgage CEG assumed.   He alleges that the transaction amounted to a fraudulent conveyance because CEG did not receive reasonably equivalent value in exchange for its agreement to assume PIAMS' $1,800,000 mortgage.

Marwil alleges that CEG's other two transactions with defendants were also fraudulent conveyances.   On August 1, 1999, COGRC signed a purchase agreement for defendants' assisted living facility in Stevensville, Michigan.  Am. Compl. Ex. B.  CEG assumed the facility's $3,750,000 mortgage, paid defendants $325,000 in cash at closing, and executed a promissory note for $1,000,000 to be paid to defendants in semi-annual installments of $50,000.  Am. Compl. ¶ 40.

The total purchase price of $5,075,000 equaled the upper bound of DeAngelis'
appraised value. However, defendants had acquired the facility three months
prior to the August 1999 transaction for only $3,075,000. Marwil alleges that
there was no reasonable basis from which to conclude that the facility's value had
increased by $2,000,000 in three months. Am. Compl. ¶ 43. He asserts that CEG
did not receive reasonably equivalent value in exchange for its $5,075,000
because the facility was worth much less than CEG paid for it.

In December 2001, CEG and its subsidiaries PIAMS, COGRC, UMS, QMM,
LLC, and Resource Development Properties, Inc., agreed with defendant Cluff to
assume control of his business, Partners in Action of Indianapolis (PIAI), which
owned two federally regulated, low-income housing complexes in Indianapolis,
Indiana. PIAI had obtained financing through $33,845,000 in bonds from the City
of Indianapolis to renovate the properties in August 1999. The bonds were
accompanied by a loan agreement that placed many restrictions on the sale or
transfer of the Indianapolis properties. Specifically, the loan agreement provided:
"The Developer [PIAI] shall not voluntarily sell, lease, exchange, transfer, assign,
convey, or otherwise dispose of all or any portion of the Project" without meeting
several enumerated conditions, including the prior written consent of the bond
owners. Am. Compl. ¶ 54. Any violation of the conditions would "cause the entire
amount due under the promissory notes to be immediately due and payable" and
would cause title to revert back to PIAI. Am. Compl. ¶ 55. The loan agreement

also prohibited PIAI from transferring any interest in itself without prior written consent of the bond insurer.  Am. Compl. ¶ 56.

Marwil alleges that, notwithstanding the loan agreement, Cluff and PIAI transferred ownership of the Indianapolis properties to CEG and its subsidiaries in exchange for approximately $36,651,000 in cash, commercial properties, and debt assumption.  He claims that CEG did not receive reasonably equivalent value in exchange for its $36,651,000.  He also alleges that the loan agreement precluded defendants from transferring marketable title to the Indianapolis properties, resulting in a failure of consideration and thus a breach of contract.  Additionally, he alleges that the defendants committed fraud by representing that they possessed marketable title, a fact upon which he alleges CEG relied to its detriment.

Marwil and the defendants held a conference on June 3, 2005, to settle the claims arising from the transactions discussed above.  Marwil alleges that the parties entered into a settlement agreement on December 5, 2005, under which the defendants were to provide Marwil, in his capacity as receiver for CEG, with $4,000,000 in cash, a promissory note for $750,000 payable to CEG one year after the closing date, a stipulation to secure payment of the note, and a writing forfeiting defendants' rights to the $1,000,000 promissory note CEG signed on August 1, 1999.  Am. Compl. ¶ 99.  The court approved the settlement agreement

on February 27, 2006.  Marwil alleges that the defendants failed to deliver the promised consideration and materially breached the settlement agreement.

*Discussion*

I.   *Defendants' Rule 12(c) Motion for Judgment on the Pleadings*

Defendants seek judgment on the pleadings for all claims asserted in the Amended Complaint.  They argue that Marwil, as conservator and receiver for CEG, does not have standing to bring suit on behalf of the CEG's noteholders or other creditors, to whom they argue the asserted claims belong.

The role of a receiver is to "promote orderly and efficient management of . . . property involved in a dispute for the benefit of the creditors."  *Marwil v. Farah*, 2003 WL 23095657, at *5 (S.D. Ind. Dec. 11, 2003) (related case arising from CEG insolvency), quoting 13 Moore's Federal Practice § 66.03 (3d ed. 1997).  The benefit to creditors contemplated by receivership law, however, is only a derivative one.  The general rule is that a receiver may pursue only the rights and claims that belong to the receivership entity itself.  See *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 429-34 (1972) (affirming dismissal of bankruptcy trustee's action; trustee lacked standing to sue on behalf of bond holders of debtor); *Troelstrup v. Index Futures Group, Inc.,* 130 F.3d 1274, 1277-78 (7th Cir. 1997) (vacating judgment in case brought by receiver on behalf of creditors of the receivership entity); *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th

-10-

Cir. 1995) ("an equity receiver may sue only to redress injuries to the entity in receivership"); *Marwil v. Farah*, 2003 WL 23095657, at *5-6 (limiting scope of language in court order appointing receiver).  For a receivership entity to possess claims, the entity itself must have suffered a cognizable, redressable injury reasonably traceable to the challenged action of the defendant(s).  See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Scholes v. African Enterprises, Inc.*, 838 F. Supp. 349, 353 (N.D. Ill. 1993).

Defendants observe correctly that the introductory paragraph of the Amended Complaint states that Marwil is pursuing relief "on behalf of the individuals and entities who invested in [CEG]'s investment-note program."  They argue that all claims asserted should be dismissed because Marwil is not permitted to bring claims on behalf of CEG noteholders.  See *Marwil v. Farah*, 2003 WL 23095657, at *6.  The fact that Marwil is precluded from bringing claims directly on behalf of the noteholders does not prevent him from being able to assert claims in CEG's name:

> [F]raud on the *receivership entity* that operates to *its* damage is for the *receiver* to pursue (and to the extent that investors as the holders of equity interests in the entity may ultimately benefit from such pursuit, that does not alter the proposition that the receiver is the proper party to enforce the claim).

*Id.*, quoting *Scholes v. Schroeder*, 744 F. Supp. 1419, 1422 (N.D. Ill. 1990) (emphasis in original). So long as the claims themselves seek redress for injuries suffered by CEG, Marwil can assert and pursue them against the defendants.[1]

Marwil alleges that CEG and its subsidiaries entered into four transactions with the defendants and paid a total of more than $50.2 million in cash, properties, and debt assumption for eight federally regulated housing complexes and one assisted living facility. Marwil claims that because the properties received were worth significantly less than the $50.2 million CEG paid and CEG was essentially insolvent at the time of the transactions or, alternatively, had unreasonably small remaining assets, the sales were fraudulent conveyances. He claims that one of the transactions was also marred by fraud and a breach of contract. He argues that CEG is entitled to equitable disgorgement of the consideration defendants received under all four deals.

Taking Marwil's allegations as true, CEG itself has suffered actionable injuries caused by defendants. See *Knauer v. Jonathon Roberts Fin.Group, Inc.*, 348 F.3d 230, 234 (7th Cir. 2003) (finding that diversion of funds from receivership entity constituted injury for purposes of standing); *Scholes v. Lehmann*, 56 F.3d at 754 (same); *Scholes v. African Enter. Inc.*, 838 F. Supp. 349,

---

[1]Marwil acknowledged the imprecision of the amended complaint's introduction in his brief and voluntarily sought to clarify the language. This court is permitted to allow or even require such revisions, see *Warth*, 422 U.S. at 501, but does not believe revision is necessary in this case.

353 (N.D. Ill. 1993) (same).  The reality of CEG's injuries is not diminished by the fact that the allegedly fraudulent transactions took place with the approval of CEG's senior management.  *Knauer* explains that the key consideration is whether the receivership entity is "legally distinct from the person who diverted funds from the entity."  348 F.3d at 235; accord, *Lehmann*, 56 F.3d at 754 (finding that the receivership corporations were harmed by the employee-perpetrator's fraudulent conveyances); cf. *Troelstrup*, 130 F.3d 1274, 1277 (finding no cognizable injury to the receivership entity when a person diverts funds from his own personal account rather than an account in the name of a legally distinct entity).

The Amended Complaint here alleges that CEG itself was harmed by fraudulent conveyances.  The attached exhibits indicate that the transactions were orchestrated by Jackson and Grubbs, former CEG executives who acted in violation of federal securities laws.  See *United States SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045, 1047 (S.D. Ind. 2005).  The fact that they were CEG's lawful representatives at the time of the transactions may be relevant to other defenses but does not lessen the injuries to CEG.  See *Lehmann*, 56 F.3d at 754 (finding a justiciable injury despite the fact that the perpetrator of the fraud "could lawfully have ratified the diversion of corporate assets to noncorporate purposes"); see generally *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 575 (7th Cir. 2004) ("An agent's knowledge is not imputed to the principal when the agent is acting adversely to the principal.").  Marwil's Amended Complaint adequately asserts that CEG, the receivership entity,

suffered actionable injuries.  Defendants' motion for judgment on the pleadings or dismissal for lack of subject matter jurisdiction is denied.

II.     *Defendants' Rule 12(b)(6) Motion to Dismiss*

Defendants move to dismiss Counts I-V of the amended complaint on the merits based on a variety of grounds.  Defendants first argue that Counts I and II alleging fraudulent conveyance and Count III requesting equitable disgorgement should be barred by the doctrine of *in pari delicto*.  Second, defendants argue that Counts I and II, as they pertain to the August 11, 1998 transaction, are time-barred by Indiana Code § 32-18-2-19.  Third, defendants argue that Marwil failed to state a breach of contract claim against Cluff personally in Count IV.  Finally, defendants argue that Marwil failed to plead sufficiently a claim for fraud in Count V.

A.      *In Pari Delicto*

*In pari delicto* is an affirmative defense.  See, *e.g.*, *Knauer*, 348 F.3d at 237-38 n. 6 (7th Cir. 2003).  The phrase *in pari delicto* literally means "of equal fault." *Theye v. Bates*, 337 N.E.2d 837, 844 (Ind. App. 1975), quoting *Perma Life Mufflers, Inc. v. Intern. Parts Corp.*, 392 U.S. 134, 135 (1968).  It is a portion of a longer Latin phrase, "*In pari delicto potior est conditio defendentis*," translated as "in a case of equal or mutual fault . . . the position of the [defending] party . . .  is the better one."  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306

-14-

(1985), quoting *Black's Law Dictionary* 711 (5th ed. 1979).  *In pari delicto* "is grounded on two premises:  first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman Eichler*, 472 U.S. at 306.  The doctrine is meant for use in situations in which the plaintiff is a participant in the misconduct giving rise to his or her claim.  *Williams Electronics Games*, 366 F.3d at 574.  As legal entities, corporations are subject to the *in pari delicto* defense, although the defense "loses its sting when the person who is *in pari delicto* is eliminated." *Lehmann*, 56 F.3d at 754, citing *McCandless v. Furlaud*, 296 U.S. 140, 160 (1935).

Defendants contend that the pleadings show that CEG was "intimately involved" in the alleged fraudulent conveyances.  See Am. Compl. ¶¶ 15, 17, 19 (describing various schemes in which CEG participated).  Specifically, defendants argue that the absence of allegations that CEG and its various subsidiaries were "controlled by third parties who reaped the benefits of the scheme" to defraud CEG investors implies that CEG itself made the alleged fraudulent transfers and should thus be bound by them.  See *Lehmann*, 56 F.3d at 754.  At the very least, defendants argue, CEG is equally to blame for any alleged wrongdoing, and that the *in pari delicto* defense should bar Marwil, as receiver of CEG, from pursuing the fraudulent conveyance and equitable disgorgement counts.

Two recent Seventh Circuit decisions have addressed the application of the *in pari delicto* defense to actions brought by receivers.  In *Scholes v. Lehmann*, the Seventh Circuit considered a Ponzi scheme in which the perpetrator of the fraud, a Michael Douglas, had carried out the scheme through the use of three wholly owned corporations that he had created specifically for that purpose.  The corporations solicited funds from investors,  which were used to pay dividends to previous investors and to maintain the pyramid scheme.  Douglas also caused the corporations to pay funds to himself, his ex-wife, and his favorite charities.  Douglas's scheme was eventually exposed, and he pled guilty to federal fraud charges.  In the wake of the criminal proceedings, the court appointed Scholes as a receiver for Douglas and the corporations.

Receiver Scholes filed a fraudulent conveyance action under Illinois law against the entities that had received pay-outs from the Ponzi corporations.  The Seventh Circuit held that the *in pari delicto* defense did not bar Scholes from pursuing the Illinois fraudulent conveyance action.  The court found that the rationale behind *in pari delicto* – "that the wrongdoer must not be allowed to profit from his wrong" – did not apply to the receiver's action since Douglas himself did not stand to benefit from the receiver's suit.  *Lehmann*, 56 F.3d at 754.  The wrong invoked to support the defense of *in pari delicto* was chargeable to the Ponzi scheme perpetrator.  After the receivership entities were "freed from his spell[,] they became entitled to the return of the moneys . . . that Douglas had made the corporations divert to unauthorized purposes."  *Id.*

The Seventh Circuit revisited this issue in *Knauer v. Jonathon Roberts Fin. Group*, 348 F.3d 230 (7th Cir. 2003). *Knauer* also arose out of a classic Ponzi scheme. Kenneth Payne and several other individuals operating as Heartland Financial Services and JMS Investment Group fraudulently obtained a total of over $60 million from about 1,000 investors. *Knauer* differed from *Lehmann*, however, in that the receiver in *Knauer* was not seeking to void a fraudulent conveyance but rather was pursuing tort damages against several securities broker-dealers for failing to supervise Payne adequately, who was a registered representative of the broker-dealers. *Id.* at 232.

The Seventh Circuit framed the central question in *Knauer* as whether to apply the general Indiana rule that the receiver is subject to all the defenses – including *in pari delicto* – that would have been available against the receivership entity, see *Iglehart v. Todd*, 178 N.E. 685, 690 (Ind. 1931); *Marion Trust Co. v. Blish*, 84 N.E. 814, 816-17 (Ind. 1908), or the exception to that rule, which states that a receiver may nonetheless sue to set aside fraudulent conveyances. See *Blish*, 84 N.E. at 816; *Hammond v. Cline*, 84 N.E. 827, 828 (Ind. 1908); *Franklin Nat'l Bank v. Whitehead*, 49 N.E. 592 (Ind. 1908); *State ex rel. Shepard v. Sullivan*, 21 N.E. 1093, 1093 (Ind. 1889).

The Seventh Circuit ultimately chose to apply the general rule, holding in *Knauer* that *in pari delicto* barred the receiver's tort claims. *Knauer*, 348 F.3d at 238. In doing so, the court reaffirmed that the equitable context in which the *in*

*pari delicto* defense is asserted is crucial, providing pointed guidance for a fraudulent conveyance case like this one: "If the case before us involved the voiding of a fraudulent conveyance, as in *Scholes* [*v. Lehmann*] or the Indiana cases just cited, we would likely apply *Scholes* and the Indiana law favoring exceptional treatment of receivers in those circumstances." *Knauer*, 348 F.3d at 236.

In the Seventh Circuit's view, the key distinction between *Lehmann* and *Knauer* was that in *Lehmann* the receiver had been seeking to recover "diverted funds from the beneficiaries of the diversions," while the defendants in *Knauer*, the broker-dealers, "had derived no benefit from the embezzlements." *Id.*  *In pari delicto* applied in *Knauer* because the equitable balance favored the defendants, who had not received any of the diverted funds and whose "involvement in the Ponzi scheme as a whole was quite minor." *Id.* at 237.  On the other side of the equation, the Ponzi entities, as a result of the machinations of Payne, "were very much at the forefront of the Ponzi scheme." *Id.*

Applying the reasoning of *Scholes v. Lehmann* and *Knauer*, the court cannot hold as a matter of law based on the pleadings that *in pari delicto* applies here. The "equitable alignment" alleged here resembles *Lehmann* more closely than *Knauer*.  Marwil alleges that CEG, acting under the control of CEG executives Grubbs and Jackson, unlawfully conveyed assets from CEG to the defendants.

Pl. Br. 13.[2]   As in *Lehmann*, the defendants in this case are also the principal beneficiaries of the alleged fraudulent conveyances.   Assuming for the purposes of this motion that Marwil's allegations are true, the benefit derived by defendants as a result of the fraudulent conveyances could put this case within Indiana's equitable exception to the rule that a receiver is subject to all the defenses that would be available against the receivership entity.   See *Blish*, 84 N.E. at 816 (general rule is "subject to the exception that the receiver so far represents the general creditors that he may avoid transactions in fraud of their rights"); *Hammond*, 84 N.E. at 828 (the receiver "takes over nothing but what belongs to the corporation, except, in certain cases, where the corporation is estopped by its fraud, he takes the right to prosecute an action for an avoidance of the transaction for the use of the general creditors").

   This result does not ignore the important question of CEG's comparative culpability in the transaction.   Grubbs and Jackson are no longer at the helm of CEG.   Pl. Br. 13.   While the removal of the fraud perpetrators from the receivership entity may lessen the "sting" of the *in pari delicto* defense, see *Lehmann,* 56 F.3d at 754, it might not totally exculpate the receivership entity. The degree to which the perpetrators' actions can be imputed to CEG depends on

---

[2]Defendants correctly point out that the amended complaint does not mention Jackson or Grubbs.   The court may, however, consider documents incorporated by reference into the pleadings.  The contractual agreements between CEG and defendants, Exhibits A-D attached to the amended complaint, bear Jackson's and Grubbs' signatures, permitting a reasonable inference of their participation in the transactions.  Additionally, Marwil alludes to their roles in his brief.  Pl. Br. 13.

the facts and cannot be decided here on the basis of the pleadings alone. As the Seventh Circuit recognized in *Knauer*, "*in pari delicto* is an affirmative defense and generally dependent on the facts, and so often not an appropriate basis for dismissal." *Knauer*, 348 F.3d at 237 n.6 (affirming dismissal, though, based on facts "thoroughly alleged" in the complaint"). Based on the pleadings, the court cannot conclude as a matter of law that CEG's alleged fault in the transactions equaled or exceeded that of defendants. Defendants are not entitled to dismissal of Counts I, II, and III on this basis.

B.    *Timeliness*

Defendants argue that the claims Marwil asserts in Counts I and II, as they pertain to the August 11, 1998 transaction, are untimely and should be dismissed. Indiana Code § 32-18-2-19 requires plaintiffs to assert fraudulent transfer claims "not later than four years after the transfer was made or the obligation was incurred." Marwil filed the original complaint on May 23, 2003, nearly a year after the expiration of the statute of limitations for claims arising from the August 11, 1998 transaction. Defendants answered the complaint on August 13, 2003, without raising the affirmative defense of untimeliness. Docket No. 15. Defendants filed a motion for leave to file amended affirmative defenses on April 5, 2005, Docket No. 57, which Magistrate Judge Shields granted on April 11, 2005. Docket No. 59. Defendants' amended affirmative defenses included the assertion that Marwil's claims that accrued prior to May 23, 1999 were untimely. Docket No. 60. Marwil argues that defendants have waived the

right to assert the affirmative defense of untimeliness because they failed to plead it in their answer to the original complaint.

Federal Rule of Civil Procedure 8(c) requires defendants to plead affirmative defenses, including the statute of limitations defense, in their answers to plaintiffs' complaints. Fed. R. Civ. P. 8(c). The intent is to avoid surprise and undue prejudice to the plaintiff by providing him with notice of the asserted defense and the opportunity to demonstrate why it should not prevail. *Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir. 1997), citing *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 350 (1971). Essentially, Rule 8(c) is intended to ensure that defendants cannot "'lie behind a log' and ambush a plaintiff with an unexpected defense." *Venters*, 123 F.3d at 968, quoting *Perez v. United States*, 830 F.2d 54, 57 (5th Cir. 1987).

The court has the discretion to permit a defendant to amend his answer to assert an affirmative defense not raised initially, just as the court may allow a plaintiff to raise a new claim. Rule 15(a) states that leave to amend a pleading "shall be freely given when justice so requires." A potential affirmative defense may become apparent during discovery, for instance, in which case it would be reasonable for the court to allow the assertion of that defense. The appropriate action for the defendant to take, of course, is to seek promptly the court's leave to amend the answer as soon as he realizes an affirmative defense may be available. *Venters*, 123 F.3d at 968. As a general rule, the Seventh Circuit allows

defendants to amend their answers to include the statute of limitations defense when plaintiffs had sufficient notice that such a defense was available and had an adequate opportunity to respond to it despite the defendants' belated assertion. *Jackson v. Rockford Housing Auth.*, 213 F.3d 389, 393 (7th Cir. 2000).

Defendants asserted the untimeliness defense almost two years after Marwil filed the original complaint.  In a different case, perhaps, such delay would be sufficient to deny their motion for dismissal.  In *Venters*, which Marwil urges the court to follow, the court found that the defendant inappropriately invoked the untimeliness defense in a brief filed "at the eleventh hour" and caused undue prejudice to the plaintiff.  *Venters*, 123 F.3d at 969.  Here, however, defendants' delay in asserting the defense has not unfairly harmed Marwil.  Unlike the plaintiff in *Venters*, who had only one day to submit evidentiary materials opposing the newly asserted affirmative defense, Marwil has had ample time to respond to the new defense and to adjust his arguments accordingly.

Defendants have prevented unfair surprise.  They filed their amended affirmative defenses not at the "eleventh hour" but nearly four months before the scheduled trial date.  They did so in a procedurally appropriate manner, *Jackson*, 213 F.3d at 393, not by "lying behind a log" and "ambushing" Marwil.  See *Venters*, 123 F.3d at 968.  Moreover, Marwil has not offered evidence tending to show that he was in any way surprised by the defense or was unaware of his claim before the statute of limitations had expired.  See *Blaney v. United States,* 34 F.3d

509, 513 n.4 (7th Cir. 1994) (discussing the doctrines of equitable tolling and equitable estoppel and their inapplicability to a case in which plaintiff offered no explanation for his delay in filing).  Defendants' motion to dismiss Counts I and II as they pertain to the August 11, 1998 transaction is granted.

C.      *Breach of Contract*

Marwil alleges that defendants breached the contract for the December 2001 transaction.  He asserts that defendants lacked marketable title in the Indianapolis properties they were attempting to convey and thus failed to provide consideration for CEG's payment of $36,651,000.  Defendants move to dismiss the claim as it pertains to defendant Cluff, who they argue is not personally liable for the actions of Partners in American and its subsidiaries.

The contract is governed by Indiana law, under which the personal liability of corporate officers is determined by common law rules of agency.  *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1231 (Ind. 1994), citing *Indiana Dept. of Pub. Welfare v. Chair Lance Serv.*, 523 N.E.2d 1373, 1377 (Ind. 1988).  Generally, corporate officers are not personally responsible for the contractual obligations of the corporation they represent.  *Winkler*, 638 N.E.2d at 1231.  When a corporate officer signs a contract on behalf of a corporation and acts within his or her authority in doing so, the remedy of a party seeking to enforce the contract is against the corporation, the principal, and not the officer, the agent.  *Id.*  Although a corporation can act only through its agents – officers, shareholders, and

-23-

employees – the corporate entity is legally responsible for the agents' actions. *Id.* at 1232, citing *Chair Lance Serv.*, 523 N.E.2d at 1377. Indiana courts will "pierce the corporate veil" and impose personal liability on a corporate agent only when a plaintiff shows that the agent personally guaranteed the corporation's obligation or treated the corporation as a conduit for personal business affairs, and the imposition of personal liability is necessary to avoid injustice. *Puller Mortgage Associates, Inc. v. Keegan*, 829 F. Supp. 1507, 1520 (S.D. Ind. 1993); *D.S.I. v. Natare Corp.*, 742 N.E.2d 15, 26-27 (Ind. App. 2000); *Weeks v. Kerr*, 486 N.E.2d 10, 12 (Ind. App. 1985).

Marwil has not alleged that Cluff personally guaranteed PIA's obligation or that Cluff treated PIA as a conduit for his personal business affairs. Likewise, the December 2001 contract does not facially indicate that Cluff intended to act in anything but an agency capacity. Above Cluff's signature line are the words "Partners in Action of Indianapolis, Inc.," and below it are the titles of his positions at the corporation, "President and CEO." Am. Compl. Ex. D. Marwil acknowledges in his brief that "Cluff is not a party to the [contract], and personally made no representations or warranties in the agreement itself," and clarifies that he intended to seek relief only against PIA in Count IV despite using the term "defendants." Pl. Br. 18. Accordingly, the court grants defendants' motion to dismiss Count IV as it pertains to Cluff. This decision does not affect Count IV against PIA.

D.    *Fraud*

Defendants move to dismiss Count V for failure to state a claim of fraud upon which relief can be granted. They argue that it was unreasonable for CEG to rely unquestioningly on representations the defendants are alleged to have made. Defendants argue that CEG either unreasonably ignored the information contained in the "status report" defendants provided to it or did not exercise due diligence to determine what restrictions the bonds might impose on the properties.

Federal Rule of Civil Procedure 9(b) provides: "In all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity." This heightened pleading requirement is a response to the "great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007), citing *Payton v. Rush-Presbyterian-St. Luke's Medical Center*, 184 F.3d 623, 627 (7th Cir. 1999). To satisfy the requirements of Rule 9(b), a plaintiff must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated. . . ." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) (citations omitted); see also *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997). "What a claim of fraud must include . . . is 'particularity' about the details – 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Hemenway v. Peabody*

*Coal Co.*, 159 F.3d 255, 261 (7th Cir.1998), quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990).

Marwil's fraud allegations survive defendants' motion.  Marwil alleges that the defendants represented that they held marketable title in the Indianapolis properties that were the subject of the December 2001 transaction.  Am. Compl. ¶¶ 89-91.  He alleges both that defendants failed to inform CEG and its entities that they lacked marketable title, Am. Compl. ¶ 90, and that defendants, Cluff in particular, affirmatively represented to CEG that the transaction was "authorized and permissible," Am. Compl. ¶ 91, though they knew it was not.  Am. Compl. ¶ 89.  Marwil contends that the representations were made during the negotiations concerning the December 2001 contract, Am. Compl. ¶ 91, and that defendants intended CEG to rely on them in agreeing to sign the contract.  Am. Compl. ¶ 89.  Marwil asserts that CEG was reasonable in its reliance and suffered substantial financial injury as a proximate result thereof.  Am. Compl. ¶¶ 92-93.

Taking the well-pleaded allegations to be true and viewing them in the light most favorable to the plaintiff, Marwil's fraud claim survives defendants' motion to dismiss.  Marwil has alleged the requisite elements of actual fraud with sufficient particularity to satisfy the requirements of Federal Rule of Civil Procedure 9(b); he has delineated "the who, what, when, where, and how." *DiLeo*, 901 F.2d at 627.

Defendants contend that CEG's reliance upon any representation made during negotiations was unreasonable as a matter of law. They assert that CEG was not sufficiently diligent in investigating the status of the title, which defendants claim could have been ascertained from a "status report" they provided CEG. Def. Br. 10. This argument is unpersuasive, at least as a matter of law. Marwil alleges that defendants falsely stated that they could convey a marketable title, which necessarily implied that they had secured all of the consents and had complied with other conditions needed to convey such marketable title. The law recognizes that the "recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." *United States v. Rosby*, 454 F.3d 670, 677 (7th Cir. 2006), citing Restatement (Second) of Torts § 540 (1977). At the very least, whether CEG reasonably relied on the alleged misrepresentations cannot be resolved as a matter of law on the pleadings. Accordingly, defendants' motion to dismiss Count V is denied.

*Conclusion*

For the foregoing reasons, defendants' motion for judgment on the pleadings is denied. Defendants' motion to dismiss Marwil's claims under Rule 12(b)(6) is granted with respect to the portions of Counts I and II based on the 1998 Memphis transaction and any claim in Count IV against defendant Cluff personally, and denied in all other respects.

So ordered.

Date: September 5, 2007

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Terence G. Banich
JENNER & BLOCK LLP
tbanich@jenner.com

Garrett C. Carter
CONNELLY ROBERTS & MCGIVNEY LLC
gcarter@crmlaw.com

Thomas M. Knepper
KNEPPER & GLADNEY
tk@kg-legal.com

Elliott D. Levin
RUBIN & LEVIN, PC
edl@rubin-levin.net

Jeff Jacob Marwil
WINSTON & STRAWN LLP
jmarwil@winston.com

Sue Figert Meyer
RUBIN & LEVIN
sue@rubin-levin.net

Steven James Scott
CONNELLY ROBERTS & MCGIVNEY LLC
rstachnik@crmlaw.com

Shelley  Smith
JENNER & BLOCK LLC
ssmith@jenner.com

Raymond E. Stachnik
CONNELLY ROBERTS & MCGIVNEY LLC
rstachnik@crmlaw.com